UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

JERRY MORGAN,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )    CIVIL NO.  4:15cv69
                                 )
BALL METAL BEVERAGE              )
CONTAINER CORP. d/b/a            )
BALL CORPORATION,                )
                                 )
        Defendant.               )

<u>OPINION AND ORDER</u>

This matter is before the court on a motion for summary judgment filed by the defendant, Ball Metal Beverage Container Corp. ("Ball"), on November 16, 2016.  The plaintiff, Jerry Morgan ("Morgan"), filed his response on January 9, 2017, to which Ball responded on February 2, 2017.

For the following reasons, the motion for summary judgment will be granted.

<u>Summary Judgment</u>

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. <u>Id</u>. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in

that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

### Discussion

Morgan has sued his employer, Ball, alleging violations of the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), and the Age Discriminaiton in Employment Act ("ADEA"). Morgan alleges discrimination and retaliation.

Ball manufactures aluminum beverage cans and bottles at its Monticello, Indiana plant. (Declaration of Paula Thoennes ("Thoennes Decl.") ¶4). Morgan, who was born in 1954, worked for Ball and its predecessor companies from September 1991 until his resignation in October 2002. (Thoennes Decl. ¶9; Morgan Dep. 11:8-9). On or around May 5, 2007, Ball rehired Morgan as a Maintenance Supervisor at the Monticello plant. (Thoennes Decl. ¶9; Morgan Dep. 41:20-22, 96:2-16); Dkt. 1, ¶14). As a Maintenance Supervisor, Morgan supervised approximately fourteen employees and managed the maintenance function at the Monticello plant. (Thoennes Decl. ¶7). From May 5, 2007 until his termination on November 25, 2014, Morgan reported to Freddy Spencer, Engineering Manager, who was born in1956. (Morgan Dep. 41:25-42:2, 68:3-15; Declaration of Freddy Spencer ("Spencer Decl.") ¶¶2, 4, 5; Dkt. 1, ¶¶ 14, 28). Morgan received Ball's Hourly Employee Handbook by at least January 4, 2011. (Morgan Dep. 131:23-132:12, Ex. 8).

In or around April 2010, Chris Czajkowski, who was born in 1968, became the Monticello Plant Manager. (Declaration of Chris Czajkowski ("Czajkowski Decl.") ¶¶2-3).

2

Czajkowski implemented heightened standards for employee performance across all levels. (Czajkowski Decl. ¶4). Ball communicated to all employees that they would be held to higher performance expectations moving forward. (*Id.*). Morgan believed Czajkowski "came in . . . getting rid of everybody." (Morgan Dep. 61:21-25).

Morgan received several performance-related disciplinary warnings between 2010 and 2014. (Morgan Dep. 42:18-24). On July 2, 2010, Morgan received a performance memorandum addressing his poor leadership skills and work performance. (Morgan Dep. 138:5-19,2 Ex. 13; Thoennes Decl. ¶10, Ex. 13). The warning cautioned Morgan to immediately improve his performance in the following areas:

1.    You must gain control of your associates and show your leadership skills to gain the confidence from your department. You must demonstrate to your associates that you are trustworthy and honest.

2.    You must have follow-up and follow-through techniques making sure jobs are thoroughly and accurately completed.

3.    You must be self-motivated. Your motivation reflects on your associates.

4.    You must be focused on paying attention to details. Failing to pay attention to details leads to unnecessary downtime, missed deadlines, delays, etc.

5.    You must plan & pre-plan for work. You must get out on the floor and assess jobs, work with the production group to minimize downtime, and take advantage to correct multiple issues when downtime is available.

6.    You must be professional in all you do and with all levels in our organization. i.e. Provide answers instead of excuses, no sarcastic remarks, etc. . .

(Morgan Dep., Ex. 13). The memorandum noted "We explained a few months ago that we were 'raising the bar' for the entire engineering department." (Morgan Dep., Ex. 13).

Despite his July 2, 2010, warning, on September 16, 2010, Morgan received another

disciplinary warning for a serious safety violation. (Morgan Dep. 134:22-135:7, 137:23-138:4,

Ex. 12). The warning provided that Morgan had failed to follow crucial safety procedures.

(Morgan Dep., Ex. 12). Morgan received a five day suspension, without pay, for the violation.

(*Id*.)

On October 15, 2010, Morgan and Ball executed a Last Chance Agreement ("LCA").

(Morgan Dep. 43:21-44:13, Ex. 4). The LCA provided

> Jerry, please be advised that your performance as it relates to Employee Relations
> is unacceptable. You have failed to keep our work environment free from
> workplace harassment. You have received training regarding your responsibilities
> as it pertains to preventing and stopping harassment. . . Regardless, you did not
> fulfill your responsibilities as a member of management. . . .
>
> As you are aware, you are an at-will employee and may be terminated by the
> Company at any time, with or without cause. By signing this agreement, you
> understand that the Company's willingness to continue your employment is
> dependent upon you fulfilling your EEO managerial responsibilities.

(Morgan Dep., Ex. 4). Morgan and Czajkowski signed the LCA on October 15, 2010. (Morgan

Dep., Ex. 4). Morgan does not believe the LCA had anything to do with his age or medical

condition. (Morgan Dep. 45:14-46:18).

In December 2010, Morgan received an overall "needs improvement" rating on his 2010

performance review. (Spencer Decl. ¶¶8-9, Ex. A). He also received "needs improvement"

ratings in the individual areas of integrity and trust, building effective teams, and managing and

measuring work. (Spencer Decl., Ex. A). Spencer specifically noted Morgan's subordinates did

not trust him. *Id.* Spencer also counseled Morgan that he needed to work on building an effective

team by better managing his team members. *Id.* With regard to organization, Spencer noted

"[Morgan] is sloppy in his work area and being disorganized hampers his efforts to manage his

work effectively." *Id.* Spencer concluded "[Morgan] must improve in the informing segment as well as managing his work. I would suggest he practice more organizational skills to improve in these areas." *Id.*

In 2011, 2012, and 2013, Morgan's overall performance improved slightly, but Spencer continued to counsel Morgan regarding his weaknesses. (Spencer Decl. ¶10, Exs. B, C, D). In his 2011 annual review, Morgan received an overall "meets expectation" rating, but Spencer noted Morgan needed improvement in the area of "Managing and Measuring Work." (Spencer Decl. ¶10, Ex. B). Spencer reiterated his concerns from the year before and suggested Morgan do a better job at follow through. (Spencer Decl., Ex. B). Spencer also ranked Morgan at a "needs improvement" in the area of "Building Effective Teams," noting "Jerry must improve in this area. Being a strong leader promotes growth and positive results. Taking time to listen to team members is crucial in building a good relationship. Giving very clear direction would also enhance this effort. I believe more effort needs to be aimed toward these objectives." *Id.*

In 2012, Morgan's attendance declined significantly. (Thoennes Decl. ¶11). In September 2012, Spencer and Human Resources Manager Paula Thoennes, who was born in 1967, met with Morgan to discuss his attendance. (Thoennes Decl. ¶11; Spencer Decl. ¶11). During their conversation, Morgan disclosed that several of the absences were for transitory illness like the flu. (*Id.*) Morgan also confided in Thoennes and Spencer that he had diabetes and was occasionally absent from work because of complications with the condition. (*Id.*; Dkt. 1, ¶17). Thoennes informed Morgan of his potential eligibility for FMLA leave related to his diabetes. (Thoennes Decl. ¶11). Morgan applied for and received intermittent FMLA leave in 2012, 2013, and 2014. (Morgan Dep. 132:13-134:2, 141:15-142:18, Exs. 9-10; Thoennes Decl. ¶12). Ball did

not interfere with Morgan's FMLA leave. (Morgan Dep. 53:13-20, 104:7-15).

In his 2012 performance evaluation, Morgan received an overall "meets expectations" rating, but Spencer noted Morgan still struggled in the same areas where he struggled the year before. (Spencer Decl. ¶12, Ex. C). Spencer ranked Morgan as "Needs Improvement" in the areas of "Informing" and "Managing and Measuring Work," noting:

- Informing: "Jerry has slipped in this area. He must focus on keeping me abreast of all plant operational issues and keep me informed of progress and projects."

- Managing and Measuring Work: "Jerry must improve in this area. He must be more personable in his job assignments to his direct reports so that have [sic] a clear understanding of the job at hand. He is very disorganized which hampers his efforts to manage his work effectively. Follow through and follow up are areas Jerry must improve."

(Spencer Decl., Ex. C). Spencer again concluded Morgan's review by noting "I would stress that more organizational skills would enhance his performance status." *Id.* In the employee comments section, Morgan agreed with Spencer's comments on organization, noting "This years [sic] goal is to get more organized." *Id.*

Despite this counseling, Morgan's 2013 review contained comments similar to those from his previous evaluations. (Spencer Decl. ¶13, Ex. D). Spencer rated Morgan's overall performance as effective, but noted Morgan needed to improve in the areas of operational excellence, sustainability, and creativity/innovation management. (Spencer Decl., Ex. D). On these points, Spencer noted:

- Operational Excellence: "[Morgan] has not met the goal of reducing the process spoilage areas. He must be more vigilant in finding ways to achieve this goal by actively being involved in identifying certain areas and developing a plan to improve."

- Sustainability: "Jerry has not submitted any cost cutting proposals this year. Cost

reduction is an expectation. Jerry must be more vigilant [in] finding ways to reduce cost."

- Creativity/Innovation Management: "Jerry must be proactive in finding ways to improve our processes by ideas, suggestions and actively finding support to improve/enhance our plant operations. Jerry has a very talented team that he must realize is a vital source and must tap into their knowledge."

*Id*. Spencer concluded, again counseling Morgan: "Jerry possesses very good leadership characteristics but must apply these skills to better the department. Jerry has improved in the informing segment but must improve in managing his work. I would stress that more organizational and follow-up skills would enhance his performance status." *Id.*

In approximately April 2014, Morgan requested and received a continuous medical leave for a medical condition related to his diabetes. (Morgan Dep. 54:7-10, 100:8-11; Thoennes Decl. ¶13; Dkt. 1, ¶¶ 19-22). He returned to work on April 28, 2014. (Morgan Dep. 55:19-23; Dkt. 1, ¶ 25). When Morgan returned from leave he asked to wear a walking boot with an open toe for six to seven weeks. (Morgan Dep. 54:11-15, Dkt. 1, ¶ 25; Thoennes Decl. ¶¶14). The Monticello plant's production floor requires that employees wear protective equipment and closed-toed shoes. (Thoennes Decl. ¶15). Therefore, while wearing the boot, Morgan had to work from the maintenance office and could not go on the production floor. (Morgan Dep. 54:16-21, Dkt. 1, ¶ 25). Despite this, Ball granted Morgan's request to wear the boot and work out of the office. (Morgan Dep. 54:11-15, 54:25-55:3).

Morgan alleges that while he was working out of the maintenance office and wearing the boot, Spencer called him "flipper", "gimpy" and "big foot". (Morgan Dep. 55:4-10, 55:24-56:11; Dkt. 1, ¶ 26). Morgan never complained to any member of management or Human Resources that he thought he was being discriminated against because of any disability. (Morgan Dep.

7

59:11-17).

In 2014, Spencer became increasingly frustrated with Morgan because he was not completing all his tasks. (Morgan Dep. 56:16-58:7, 103:21-104:6). Spencer had received multiple complaints from Morgan's co-workers that Morgan failed to follow through on requests. (Spencer Decl. ¶14). For example, employees complained they had to ask Morgan repeatedly to order a part or complete a task, often without success. (*Id.*) Morgan also often requested overtime hours, but still failed to complete all necessary tasks. (*Id.* ¶15). Employees reported to Spencer that they suspected Morgan was sleeping in his office early in the morning while he was on the clock. (*Id.*)

Morgan began vacation on or around May 19, 2014. (Morgan Dep. 85:14-20; Thoennes Decl. ¶16). During Morgan's vacation, Spencer filled in for Morgan. (Spencer Decl. ¶19). While acting as Maintenance Supervisor, Spencer discovered the maintenance room was in disarray and that many of Morgan's responsibilities were not being accomplished. (Spencer Decl. ¶¶19, 20). The tool room was disorganized and many of the Maintenance Department's projects were behind schedule. (Spencer Decl. ¶19). Morgan's subordinates also reported frustration with Morgan because he had not ordered parts necessary for them to complete their tasks. (Spencer Decl. ¶¶16, 20). Morgan had also failed to leave a list of projects his subordinates could complete during his vacation. (Spencer Decl. ¶20). All of the deficiencies Spencer noted could have been easily accomplished while Morgan worked out of the Maintenance Office. (Spencer Decl. ¶16).

On May 23, 2014, the Monticello plant experienced a fire which severely damaged the facility. (Thoennes Decl. ¶16; Morgan Dep. 85:14-20). Management employees worked long hours to get the plant running. (Morgan Dep. 85:20-25; Spencer Decl. ¶21). Morgan returned

8

from his vacation on Monday, May 26, 2014. (Morgan Dep. 87:16-18; Thoennes Decl. ¶16).

Spencer observed that Morgan took little initiative during the recovery process. (Spencer Decl.

¶21). After Morgan returned from his vacation in May 2014, many of his subordinates continued

to go directly to Spencer when they needed guidance or support because they did not feel

comfortable going directly to Morgan. (Spencer Decl. ¶22).

On June 27, 2014, Thoennes and Spencer met with Morgan to deliver a written warning

regarding his on-going unsatisfactory work performance. (Morgan Dep. 60:10-17; 63:15-64:8;

65:6-67:4, Ex. 5; Dkt. 1, ¶27; Thoennes Decl. ¶18; Spencer Decl. ¶¶ 23-24). During the meeting,

Thoennes and Spencer delivered a memorandum listing eight areas where Morgan did not meet

expectations. (Morgan Dep. 60:10-22, Ex. 5; Dkt. 1, ¶27). The warning outlined deficiencies in

Morgan's safety procedures, management skills, attention to quality, follow through, cost saving

efforts, communication, organization, staff motivation, and time management. (Morgan Dep., Ex.

5). The memorandum concluded:

> Our business climate does not allow us to continue to provide employment
> opportunities to those who fail to meet and sustain the level of performance to our
> expectations. After reviewing your performance with our corporate HR
> Department, we are issuing this performance appraisal to extend you the
> opportunity to step up and meet the job requirements on a consistent and sustained
> basis. Until further notified, you must take the initiative to meet with me on a
> weekly basis to review your performance. Failure to meet the expectations and
> sustain them may result in your immediate termination of employment. We expect
> to see immediate improvement in the areas that are easier to resolve and a plan in
> place for the topics that will take more time and effort. . . .
>
> By signing this agreement you understand that the Company's willingness to
> continue your employment is conditional upon you improving your performance.
> You fully understand, acknowledge and agree that, should you fail to improve
> your performance, and sustain satisfactory performance, Ball . . . may terminate
> your employment at the discretion of the Company.

(*Id.*) Morgan and Spencer signed the agreement on June 27, 2014. (*Id.*) At no point during his June 27, 2014 meeting or any time thereafter did Morgan complain he was being discriminated against. (Morgan Dep. 67:5-16, 80:22-81:19).

Morgan responded to the June 27 memorandum with a written plan for how he would improve his performance. (Morgan Dep. 139:17-140:20, Ex. 15; Thoennes Decl. ¶19). Spencer met with Morgan weekly to discuss his performance compared to the goals set forth in the June 27 memorandum. (Spencer Decl. ¶25).3 Morgan's performance did not improve. (Thoennes Decl. ¶19; Spencer Decl. ¶26). Notably, Morgan's subordinates continued to come to Spencer directly for assistance. (Spencer Decl. ¶22, 27, 29, Ex. 14). Morgan failed to complete tasks as assigned and then blamed his failings on others. (Spencer Decl. ¶27, Ex. 14). He also continued to be disorganized without a proactive plan for how to improve his performance or the operation of the Maintenance Department. (*Id.*) Although Morgan disagreed with Spencer's assessment of his performance, Morgan understood Spencer was not pleased with his job performance. (Morgan Dep. 79:13-79:17).

On November 10, 2014, Morgan began a vacation. (Thoennes Decl. ¶20). While he was on vacation, Spencer again directly managed the Maintenance Department. (Spencer Decl. ¶28). Spencer observed additional significant deficiencies with Morgan's performance. (*Id.*) Spencer learned Morgan had not taken crucial steps to obtain a part necessary to maintain operations in the plant (the "OV guard"). (*Id.*, Ex. 14). Spencer also observed that Morgan had not completed necessary safety verification forms required by OSHA. (*Id.*, Ex. 14). Spencer summarized Morgan's performance deficiencies since his June 27 performance improvement plan in a memorandum and discussed the deficiencies with Morgan. (Spencer Decl. ¶29, Ex. 14; Morgan

Dep. 138:20-139:15).

Spencer reported Morgan's ongoing deficiencies to Thoennes, who recommended Morgan's termination. Spencer agreed with Thoennes's recommendation. (Thoennes Decl. ¶21). Thoennes then met with Czajkowski to discuss Morgan's on-going performance deficiencies and recommend Morgan's termination. (Thoennes Decl. ¶21; Czajkowski Decl. ¶8). Czajkowski agreed with Thoennes's recommendation. (Thoennes Decl. ¶21; Czajkowski Decl. ¶10). Thoennes then consulted Ball's Human Resources Focal Point, Terry McGinley, to begin the process of terminating Morgan's employment. (*Id.*).

On November 20, 2014, Czajkowski, Thoennes, and Spencer met with Morgan and discussed his performance. (Morgan Dep. 68:13-69:19; Czajkowski Decl. ¶8). At the meeting, Czajkowski placed Morgan on paid administrative leave while Ball considered whether to terminate his employment. (Morgan Dep. 68:13-69:19; Thoennes Decl. ¶22; Czajkowski Decl. ¶8). Morgan did not report any alleged discrimination or retaliation. (Morgan Dep. 69:25-70:14; Czajkowski Decl. ¶9, Spencer Decl. ¶34).

Following the meeting, McGinley communicated support and approval for the termination decision. (Thoennes Decl. ¶23). On November 25, 2014, Thoennes and Spencer met with Morgan to terminate his employment. (Morgan Dep. 68:3-15; Dkt. 1, ¶28; Spencer Decl. ¶32). Consistent with past practice at the Monticello plant, a police officer then escorted Morgan to his car. (Morgan Dep. 72:16-73:24, 74:3-9, 147:15-148:6).

In the year following Morgan's termination, Plant Production Manager Rick Nydegger, who was born in 1954, Machinist Steve Oteham, who was born in 1966, and Spencer shared the responsibilities previously performed by Morgan. (Morgan Dep. 124:4-21; Spencer Decl. ¶33;

11

Declaration of Rick Nydegger ("Nydegger Decl.") ¶¶2-7).

In support of his Complaint against Ball, Morgan claims that Spencer began making age-related comments in late 2014, shortly before Morgan's sixtieth birthday. (Morgan Dep. 47:14-48:5). Morgan claims that Spencer, less than two years his junior, called Morgan "old gummer" and "old man" and asked if he was tired at the end of the day. (Morgan Dep. 38:12-39:23, 48:23-49:7; Spencer Decl. Spencer Decl. ¶4).4 On this point, Morgan testified:

> Q.   What leads you to believe that your 60th birthday had anything to do with your termination?
>
> A.   I don't, particularly. I think me having diabetes and them wanting to get rid of me all was leading up to, you're not doing your job, you're an old man, this-and-that type of thing.
>
> Q.   Well, let me try to keep these separate. I want to understand any facts that you have that lead you to conclude you were terminated because of your age, and so far you've told me there were some comments by Freddie Spencer.
>
> A.   That's the only reason.
>
> Q.   Anything else?
>
> A.   No. Other than that, I felt like I was 60, and that was part of it.

(Morgan Dep. 39:18 to 40:13). Morgan never complained regarding these comments to any member of Ball management or Human Resources. (Morgan Dep. 52:1-15). Morgan does not have any other evidence that his age motivated his termination or any other putative adverse action. (Morgan 50:14-17, 53:5-8).

In support of its motion for summary judgment, Ball claims that Morgan simply has no evidence to support his discrimination and retaliation claims. Ball argues that it terminated Morgan's employment for on-going performance deficiencies and not because of his disability,

medical leave, or requested accommodation.  To survive Ball's motion for summary judgment on

his disability discrimination claim, Morgan must "demonstrate a genuine issue of material fact as

to: (1) whether he was disabled, (2) whether he was qualified to perform the essential functions

of his job and (3) whether he was terminated because of his disability." *Quick v. City of Fort*

*Wayne*, No. 1:15-CV-056 JD, 2016 U.S. Dist. LEXIS 131868, *7 (N.D. Ind. Sept. 27, 2016)

(citing *Povey v. City of Jeffersonville, Ind*., 697 F.3d 619, 622 (7th Cir. 2012)). Similarly, to

prove his FMLA and ADA retaliation claims, Morgan must prove (1) he engaged in a protected

activity; (2) Ball took an adverse employment action against him; and (3) there is a causal

connection between the protected activity and the adverse employment action. *Soriano v. City of*

*East Chicago*, No. 2:13-CV-439 JD, 2016 U.S. Dist. LEXIS 41839, *19 (N.D. Ind. Mar. 30,

2016) (citing *Pagel v. TIN Inc*., 695 F.3d 622, 631 (7th Cir. 2012) (FMLA retaliation); *Davis v.*

*Munster Med. Research Found., Inc*., No. 2:14-CV-220, 2016 U.S. Dist. LEXIS 135159, *49-50

(N.D. Ind. Sept. 30, 2016) (ADA retaliation). For the purposes of summary judgment, Ball

assumes Morgan is disabled and engaged in protected activity under the FMLA and ADA.

　　　　Morgan conflates his FMLA and ADA clams, arguing Ball terminated his employment

because he has diabetes, took FMLA leave, and requested an accommodation. (Morgan Dep.

104:7-105:7). The Seventh Circuit recently explained that the proper inquiry for discrimination

and retaliation claims is "whether the evidence would permit a reasonable factfinder to conclude

that the plaintiff's [protected status or activity] . . . caused the discharge or other adverse

employment action. Evidence must be considered as a whole, rather than asking whether any

particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does

so, or the 'indirect' evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 2016 U.S. App. LEXIS

15284, *10 (7th Cir. 2016); see also Davis, 2016 U.S. Dist. LEXIS 135159, *35-36.

The record is clear that Ball terminated Morgan for performance deficiencies. Morgan's deficiencies ranged from a disorganized tool room to serious failures to complete production-crucial tasks. (Spencer Decl. ¶¶9-10, 12-15, 19-22, Exs. A-D, 14, Morgan Dep. 43:21-44:13, 56:16-58:7, 60:10-17; 63:15-64:8; 65:6-67:4, Ex. 5, 103:21-104:6, 134:22-135:7, 137:23-139:15, Exs. 4, 5, 13, 14; Thoennes Decl. ¶¶10, 17, 18, 20, Exs. 13, 5). Even though Morgan implies that he was not counseled for poor performance until after his April 2014 leave, the record undisputedly shows that Ball began counseling Morgan regarding his poor performance in 2010, when Czajkowski instituted higher expectations for all employees, and well before Morgan ever took medical leave. (Czajkowski Decl. ¶4; Thoennes Decl. ¶10, Ex. 13; Morgan Dep. 43:21-44:13, 61:21-25, 134:22-135:7, 137:23-19, Exs. 4, 12, 13). As noted above, in the last several years of his employment, Morgan received two written warnings, a last chance agreement, multiple "improvement needed" ratings, and a performance improvement plan. (Morgan Dep., Exs. 4, 5, 12, 13, 14; Spencer Decl., Exs. A-D) Despite this, Morgan did not adjust his performance to respond to management concerns. (Spencer Decl. ¶9-10, 12-15, 19-22, 24-27, Ex. 14). In November 2014, Morgan took a vacation and Spencer learned just how little Morgan had done to improve upon the serious performance deficiencies Ball identified in Morgan's June 2014 performance improvement plan. (Spencer Decl. ¶¶28-29, Ex. 14; Morgan Dep. 138:20-139:15).

Additionally, Ball demonstrated good faith with regard to Morgan's medical condition and related leaves. In 2012, when Morgan began missing too much work, it was Ball who suggested he may be eligible for leave. (Thoennes Decl. ¶11; Spencer Decl. ¶11). Ball never did

14

anything to prevent Morgan from taking intermittent or continuous FMLA leave; indeed it facilitated his ability to take the leave. (Morgan Dep. 53:13-20, 104:7-15). Ball never moved or reassigned Morgan following any of his leaves. Likewise, Ball allowed Morgan the only accommodation he ever requested – working in his office and wearing a boot. (Morgan Dep. 54:11-15, 54:25-55:3). Ball's only action regarding Morgan's disability, leave, or accommodation was to work with him in good faith.

The only evidence Morgan offers in support of his ADA and FMLA claims are Spencer's alleged comments in April and May 2014 calling Morgan "flipper", "gimpy" and "big foot" when he wore the walking boot. (Morgan Dep. 55:4-10, 55:24-56:11; Dkt. 1, ¶ 26). However, the law is clear that isolated comments more than six months before Morgan's termination, unrelated to the termination decision, have no bearing on the reason for his discharge. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 854-55 (7th Cir. 2015) (citing *Markel v. Bd. of Regents of Univ. of Wis. Sys.,* 276 F.3d 906, 910 (7th Cir. 2002) (comments made two months before termination decision were not contemporaneous to adverse action)); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'") (citations omitted). Even if the comments occurred, they were made during a brief period of time when Morgan wore a walking boot in April and May 2014. Morgan does not allege Spencer made the comments in conjunction with Morgan's termination or performance deficiencies. Also, Ball did not terminate Morgan until November 25, 2014, more than six months after he returned from leave and well after the alleged comments would have stopped. (Morgan Dep. 68:3-15; Dkt. 1, ¶28). Ball coached Morgan to improve his performance

15

for years before his termination and before he ever wore the boot. Spencer's alleged off handed comments months before the adverse action do not undermine Ball's explanation of the reasons for Morgan's termination.

Finally, Morgan has not identified any similarly situated employee who was treated more favorably than he was treated. Morgan can point to no employee with performance as poor as his who was retained. Morgan has nothing more than a "gut feeling" and speculation that his disability and FMLA leave prompted Ball to terminate his employment. This alone cannot carry his claim to trial. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("'It is well-settled that speculation may not be used to manufacture a genuine issue of fact.'") (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001); *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) ("The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. . . . Speculation will not suffice.") (internal citations and quotation marks omitted)); *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (citation omitted)).

Morgan points to Omar Burton, a former employee, who allegedly received a performance improvement plan and was ultimately terminated following a medical leave. (Resp., p. 8). Morgan claims Burton's experience shows a pattern or practice of discriminating against individuals who take medical leaves. However, Burton and Morgan are not similarly situated and Morgan's characterization of Burton's employment record – even if accurate – has no probative value on Morgan's claims. First, Morgan and Burton did not report to the same supervisor and Morgan has identified no evidence that any of the same decision makers made any decisions

16

regarding the two employees. (Declaration of Omar Burton ("Burton Decl.") ¶¶2, 3, 5; Morgan

Dep. 41:25-42:2, 68:3-15; Thoennes Decl. ¶¶21, 23; Declaration of Chris Czajkowski

("Czajkowski Decl.") ¶10). Second, Burton fails to provide enough information regarding his

medical leave or resulting discipline to equate his experience with Morgan's. Burton does not

explain how long he was on leave or how long after he returned from leave he received the

performance improvement plan. (Burton Decl. ¶4). If, for example, Burton received the

performance improvement plan four or more months after his return from leave, the timing is not

suspicious at all. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (holding

that a seven-week interval between a sexual harassment complaint and plaintiff's termination was

not suspicious); *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (holding

that timing was not enough, on its own, to create a jury issue on retaliation where the plaintiff

had threatened to file an EEOC complaint three months and then again six weeks before she was

fired); *Parkins v. Civil Constructors of III., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (affirming

summary judgment in favor of the employer where the employee complained of sexual

harassment in August and was laid off in November of the same year). Clearly, Morgan has not

done enough to relate Burton's experience with his own to prove any type of "pattern."

Likewise, Morgan distorts the record evidence regarding Tracy Holderfield and Scott

LaFond. Morgan claims he was similarly situated to Holderfield and LaFond, but that the two

were outside his protected classes. (Resp., pp. 9-10). In his interrogatories, Morgan sought

information regarding other employees, in Morgan's chain of command, who were counseled or

disciplined. (Dkt. 25-5, pp. 9-10).  Ball answered:

Defendant states that from January 1, 2011 through Plaintiff's termination, Scott LaFond

and Tracy Holderfield were employees subject to the same reporting structure as Plaintiff. Scott LaFond and Tracy Holderfield were both Maintenance Supervisors reporting to Freddy Spencer in the three years prior to Plaintiff's termination. Scott LaFond and Tracy Holderfield both have diabetes. Defendant further states it does not track employee disability and, therefore, is not aware if Scott LaFond or Tracy Holderfield is disabled or have a record of disability. Tracy Holderfield recently requested and received leave pursuant to the FMLA. Defendant further refers Plaintiff to its response to Request for Production No. 17.

(Dkt. 25-5, p. 10). Ball also produced the personnel files for LaFond and Holderfield, which contained their performance reviews and any discipline. (Dkts. 25-5, p. 10; 25-7; 25-8). While neither LaFond nor Holderfield were terminated for poor performance, both received counseling in their annual performance reviews. (Dkt. 25-7; 25-8). LaFond also received discipline in 2011 for performance deficiencies. (Dkt. 25-8, p. 3).

Morgan, LaFond, and Holderfield held the same or similar titles and all three men reported to Spencer. (Dkt. 25-5, p. 10; Morgan Dep. 41:20-22, 41:25-42:2, 68:3-15, 96:2-16). The men were also in the same protected classes. They all suffer from diabetes, and at least Morgan and Holderfield also requested and received FMLA leave. (Resp., p. 9; Dkt. 25-5, p. 9). Morgan argues LaFond and Holderfield were "less disabled" than Morgan and/or took less FMLA leave and, therefore, received more favorable treatment. (Resp. pp. 9-10). Ball, however, argues that this interpretation of the evidence is simply beyond the scope of any reasonable inference. For example, Morgan states, without support, that LaFond "never had any complications" with his diabetes and Ball "did not consider him to have a disability." (Resp., p. 9). Morgan cites only Ball's interrogatory answer in support of these assertions. Yet, there is absolutely no record evidence LaFond's diabetes was complication-free. The only available evidence is that LaFond has diabetes. (Dkt. 25-5, p. 10). Likewise, Morgan relies on Ball's

18

statement that it does not track employee disability in support of his position that Ball did not regard LaFond as disabled. The two are, of course, not the same. Even more, whether Ball considered LaFond "disabled" under the ADA is irrelevant. Ball was aware LaFond, like Morgan, has diabetes. The evicence shows that the two were treated the same. As Morgan's argument is completely unsupported by the available facts, his argument carries no weight. *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (noting that non-moving parties are not entitled to inferences supported by nothing more than their own speculation) (citing *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 599 (7th Cir. 2014)).

Morgan's comparator evidence also fails because Holderfield also took an FMLA leave and was not terminated or placed on a performance improvement plan. (Dkt. 25-5, p. 10). Morgan's ADA and FMLA claims rest entirely on a theory that Ball grew frustrated with him because he took FMLA leave in April 2014. Holderfield's leave and continued employment undermines this argument. Morgan attempts to resolve the conflict by arguing – again completely without support – that Holderfield requested "some" FMLA leave in 2016, implying that it was a shorter leave than Morgan's. However, Morgan can point to no evidence regarding the length of Holderfield's leave. Thus, Morgan can point to no comparators who were outside his protected classes who were treated more favorably. Accordingly, the court will grant Ball's motion for summary judgment on Morgan's ADA and FMLA claims.

Next, Ball argues that Morgan has offered nothing to support his age discrimination claim. Morgan can only avoid summary judgment on his age discrimination claim if he "produce[s] evidence from which a jury could infer that [his] age 'was a but-for cause of his termination.'" *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014) (citing *Fleishman v.*

19

*Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)); *see also Carson v. Lake Cnty.*, No.: 2:14-CV-117-PRC, 2016 U.S. Dist. LEXIS 124456, *24 (N.D. Ind. Sept. 14, 2016) (citing Ortiz) (noting "a plaintiff may demonstrate a genuine issue for trial by demonstrating that 'the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . [age]. . . caused the discharge or other adverse employment action.'").

Morgan's age discrimination claim first fails because there is no evidence that Ball developed an age bias during Morgan's employment. Ball recruited Morgan to return to the Maintenance Supervisor position in 2007, when Morgan was already 53 years old, well over the protected age class. (Morgan Dep. 11:8-9, 41:20-22, 96:2-16). There is no evidence that Ball somehow acquired an age bias against Morgan less than eight years later and terminated him for that reason. Morgan's age discrimination claim also fails for the same reason his ADA and FMLA claims fail. That is, Morgan cannot rebut Ball's explanation for his termination with any convincing evidence of age-related bias. The only evidence Morgan offers in support of his age claim are alleged comments by Spencer to Morgan that Morgan was an "old man" and "gummer." (Morgan 50:14-17, 53:5-8). These types of comments alone simply do not support an age discrimination claim. *See Fleishman*, 698 F.3d at 605 ("[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'") (citations omitted). Morgan does not allege Spencer made the comments in conjunction with his termination or discipline. Morgan's conduct also undermines his claim that he took Spencer's statements seriously. Morgan never reported any alleged comments to a member of management or Human Resources and never complained

at any point that he believed he was being discriminated against because of his age. (Morgan Dep. 52:1-15, 67:5-16, 69:25-70:14, 80:22-81:19).

As noted, Morgan also undermines his age claim by claiming first that his age motivated his termination, and then that it did not, and ultimately admitting he only feels like his age motivated his termination:

> Q.    What leads you to believe that your 60th birthday had anything to do with your termination?
>
> A.    I don't, particularly. I think me having diabetes and them wanting to get rid of me all was leading up to, you're not doing your job, you're an old man, this-and-that type of thing.
>
> Q.    Well, let me try to keep these separate. I want to understand any facts that you have that lead you to conclude you were terminated because of your age, and so far you've told me there were some comments by Freddie Spencer.
>
> A.    That's the only reason.
>
> Q.    Anything else?
>
> A.    No. Other than that, I felt like I was 60, and that was part of it.

(Morgan Dep. 39:18 to 40:13). Morgan's feelings, without more, cannot support his age discrimination claim.

Morgan also cannot identify any younger employee who received more favorable treatment. Following Morgan's termination, Nydeggar, Spencer, and Oteham performed the Maintenance Supervisor tasks. (Morgan Dep. 124:4-21; Spencer Decl. ¶33; Nydegger Decl. ¶¶4-7). Spencer is less than two years younger than Morgan and Nydegger is slightly older. (Spencer Decl. ¶4; Nydegger Decl. ¶3; Morgan Dep. 11:8-9). Accordingly, as Morgan has no evidence of age discrimination, the court will grant summary judgment in favor of Ball on his ADEA claim.

<u>Conclusion</u>

On the basis of the foregoing, Ball's motion for summary judgment [DE 20] is hereby

GRANTED.


Entered: April 6, 2017.




s/ William C.  Lee
William C. Lee, Judge
United States District Court

22